UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PETER TSADILAS,<br><br>                Plaintiff,<br><br>  -against-<br><br>NASSAU COUNTY SPCA DETECTIVE MATTHEW ROPER, and THE NASSAU COUNTY SPCA,<br><br>                Defendants. | **AMENDED COMPLAINT**<br><br>Docket: 21-cv-2765<br><br>JURY TRIAL DEMANDED |

The Plaintiff, Peter Tsadilas, complaining of the Defendants through his attorneys at Barket Epstein Kearon Aldea & LoTurco, LLP, respectfully shows to this Court and alleges that he was deprived of his civil rights and sustained injury as a result of this deprivation.

## JURISDICTION AND VENUE

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as the claims in this action arise under 42 U.S.C. § 1983.

2. Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b), because that is the judicial district in which the claims arose, and in which Defendant Ropers resided or conducted business.

## PARTIES

3. Plaintiff, Peter Tsadilas, is a resident of Suffolk County, New York, and was the victim of a malicious prosecution, false arrest and abuse of process forming the basis of this action.

4. Defendant Matthew Roper was at all relevant times an agent of Nassau County's Society for the Prevention of Cruelty to Animals (the "SPCA"), working with its assent, for its benefit and under its control, and was acting under color of state law. He is sued in his individual capacity.

1

5. Defendant SPCA is a state actor and 501(c)(3) organization specifically designated and authorized by New York State to operate as peace officers, to enforce certain laws, and to effectuate certain arrests related to the treatment of animals on behalf of the State. *See, e.g.,* Agriculture and Markets Law §371.

## FACTS

6. Peter Tsadilas is a father, restaurant-owner, and dog-lover.

7. On June 26, 2018, Mr. Tsadilas's family owned two dogs—a small shih tzu named Polo and a golden Labrador named Callie.

8. On or about June 26, 2018, Mr. Tsadilas let Polo and Callie out of the house to go to the bathroom—something he had done many times in the past.

9. Minutes later, Mr. Tsadilas looked outside and could not see Callie.

10. Mr. Tsadilas went outside and could not find Callie.

11. Mr. Tsadilas began looking for Callie around his neighborhood.

12. During his search, Mr. Tsadilas flagged down a police officer from Oyster Bay Cove for help.

13. In the early morning hours of June 27, 2018, a good Samaritan found Callie outside in the rain.

14. The good Samaritan took Callie home with her and kept her outside for approximately five more hours, waiting for the local animal shelter to open.

15. At approximately 10:00am on June 27, 2018, the good Samaritan took Callie to the animal shelter in Oyster Bay (the "Shelter").

16. Mr. Tsadilas had had a chip installed from the American Kennel Club that helps track down dogs when they go missing.

17. Upon using the chip, Mr. Tsadilas communicated with the Shelter looking for his dog and seeking its return to him.

18. While Callie was in the Shelter's custody, she was observed by a veterinarian, Dr. Tundo, and on June 29, 2018 a tumor was identified in Callie's stomach.

19. In addition to a series of conditions that Callie could have sustained by virtue of being outside in the rain and elements, and an ear condition that had afflicted Callie for years as documented explicitly in her veterinary records, Dr. Tundo noted that Callie appeared to be underweight.

20. Dr. Tundo recommended a biopsy and for the tumor to be removed with dispatch.

21. By July 2, 2018, the tumor had not been removed.

22. On July 2, 2018, Mr. Tsadilas received a phone call from Defendant Roper (the "July 2 Call").

23. Mr. Tsadilas and Defendant Roper had spoken to each other in the past.

24. Defendant Roper also knew of Mr. Tsadilas through one of his cousins, A.D. (the "Cousin"), who had gone to high school and developed an acrimonious relationship with Mr. Tsadilas.

25. On the July 2 Call, Defendant Roper gave Mr. Tsadilas a choice: he could either assign ownership of Callie over to Nassau County, or he could be arrested and prosecuted for animal cruelty.

26. On the July 2 Call, Mr. Tsadilas told Defendant Roper to "go f--- yourself," informing Defendant Roper that Callie belonged to his daughter, that he had had the dog for seven years, and that he would not give it away.

27. The following morning, July 3, 2018, Defendant Roper arrived at Mr. Tsadilas's home at approximately 8:00am.

28. After Mr. Tsadilas opened the door for Defendant Roper, Defendant Roper stated in sum and substance, "F--- me? F--- you, motherf----er. You're under arrest."

29. Defendant arrested Mr. Tsadilas in his underwear, and he was only given pants because of the assistance of a separate officer on the scene.

30. Defendant Roper put Mr. Tsadilas into the back of a black SUV.

31. Defendant Roper did not gather Polo, who was in the home and showed no signs of distress.

32. Defendant Roper told Mr. Tsadilas, in sum and substance, that he was hoping that Mr. Tsadilas would not be home and that he would instead have been at the diner he owned, because he wanted to "embarrass you in front of all your customers."

33. Mr. Tsadilas complained of how tight the handcuffs were, and Defendant Roper went into the back seat and made the cuffs even tighter.

34. Defendant Roper told Mr. Tsadilas that because he was Greek, he would "love where [he was] going"—implying that Mr. Tsadilas was homosexual because of his nationality and that he was going to get raped in prison.

35. Defendant Roper called Mr. Tsadilas a "Greek n--ger."

36. Mr. Tsadilas began to cry in the back seat of the SUV, pleading that he had done nothing wrong and inquiring why this was being done to him.

37. Defendant Roper said, because "I don't like you."

38. Defendant Roper told Mr. Tsadilas in sum and substance, "I don't want to take you to jail. I want to take you sailing with [the Cousin] and beat the living s--t out of you and throw you overboard."

39. Eventually, Defendant Roper and Mr. Tsadilas arrived in the black SUV at their destination, where Mr. Tsadilas was taken to a cell.

40. After being processed, Defendant Roper told Mr. Tsadilas in sum and substance that he was going to allow him out of the unit through a back door to "avoid all the press." He then led Mr. Tsadilas through a door where several press members were waiting to snap Mr. Tsadilas's picture.

41. Mr. Tsadilas was arraigned on July 3, 2018.

42. Mr. Tsadilas was charged with violating section 353 of the Agriculture and Markets Law—to wit, overdriving, torturing, and injuring animals; failure to provide proper sustenance."

43. On or about August 24, 2018, the shelter returned Callie to Mr. Tsadilas's ex-wife, Christine Dickovitch.

44. The tumor had still not been removed from Callie's stomach by anyone working at or for Nassau County.

45. Defendant Roper did not notify Ms. Dickovitz of the tumor at all.

46. On August 27, 2018, Defendant Roper communicated with a Nassau County assistant district attorney ("ADA") about the case.

47. During the August 27, 2018 communication with the ADA, the ADA told Defendant Roper to "let Christine know that the dog license is about to expire." In response, Defendant Roper expressed a preference for leveraging the impending expiration into prejudicial information in court, stating: "Do you want me to do that[?] That's a misdemeanor arrest in New

York and … if they [are] loving parents they should know this[.] Might be good to bring up in court."

48. Mr. Tsadilas's ex-wife brought Callie to a veterinarian who, on October 8, 2018, performed emergency surgery.

49. On October 8, 2018, an ovarian mass was removed from Callie's stomach that weighed more than six pounds (the "Six Pound Mass").

50. Once the Six Pound Mass was removed from Callie's stomach, her health began rapidly improving.

51. Nevertheless, Defendant Roper urged the ADA to continue prosecuting the case against Mr. Tsadilas.

52. Defendant Roper visited the veterinarian who removed the Six Pound Mass and reprimanded her.

53. Ultimately, no charges were dropped against Mr. Tsadilas despite the absence of probable cause that he had committed any crime at all, let alone a violation of Section 353 of the Agriculture and Markets Law.

54. On September 16, 2019, Mr. Tsadilas was acquitted by a jury after trial.

55. Mr. Tsadilas timely served a notice of claim within ninety days of his acquittal.

56. Mr. Tsadilas was questioned at a 50-H examination held on January 31, 2020, and since that time his claims have not been paid, settled, or adjusted.

**CAUSE OF ACTION:**

**FIRST:  MALICIOUS PROSECUTION UNDER 42 U.S.C. SECTION 1983**

57. Plaintiff reasserts all of the above-stated allegations as if set forth more fully again herein.

58. Defendant Roper was at all times acting under color of state law and in the scope of his employment.

59. Defendant Roper initiated criminal proceedings against the Plaintiff in Nassau County, where he was charged with violating Section 353 of the Agriculture and Markets Law.

60. Defendant Roper advised and encouraged the ADA to prosecute the Plaintiff.

61. Defendant Roper signed the accusatory instrument against the Plaintiff.

62. The criminal charges against the Plaintiff were terminated in his favor as the sole charge resulted in a 'not guilty' verdict after trial.

63. Plaintiff's liberty was restrained post-arraignment, including by having to return to criminal court repeatedly pre-trial and at trial from July 2018 to September 2019, and during the entire period of time from his arraignment to the dismissal of charges had to render himself amenable to the orders and processes of the Court.

64. There was no probable cause to prosecute the Plaintiff at the time of his arrest or arraignment, and, to the contrary, readily available evidence demonstrated a high level of care that Plaintiff offered to Callie—including but not limited to veterinarian records showing proper attention to her medical conditions; a chip installed in Callie pursuant to protocols set by the American Kennel Club; records of at least one prior meeting between Mr. Tsadilas and the SPCA itself, at which Callie was deemed by a detective to be "alert, good weight, and happy;" observable evidence of the health of Mr. Tsadilas's other dog, Polo, about whom there were no allegations of malnourishment; a known and innocent explanation for Callie's appearance at the shelter—namely, that she had gone missing and been in the rain and elements overnight; Mr. Tsadilas's own unwillingness to assign Callie over to Nassau County—despite express warnings that his failure to do so would come at great risk of criminal prosecution; and scans detecting a large but

unknown tumor in Callie's stomach—a tumor that was not investigated or removed despite Dr. Tundo's recommendation.

65. If there had been probable cause at the time of Plaintiff's arrest or arraignment, which there was not, it had dissipated in and around October 8, 2018, when the Six Pound Mass was discovered and removed, leading to Callie's rapid recovery.

66. Plaintiff is entitled to compensatory and punitive damages to be decided by a jury.

67. Plaintiff is entitled to attorneys' fees under 42 U.S.C. Section 1988(b).

**SECOND: MALICIOUS ABUSE OF PROCESS UNDER 42 U.S.C. §1983**

68. Plaintiff reasserts all of the above-stated allegations as if set forth more fully again herein.

69. Defendant Roper employed regularly issued legal (criminal) process when he arrested and initiated the prosecution of Mr. Tsadilas.

70. Defendant Roper intended to cause Mr. Tsadilas harm without excuse or justification, a fact corroborated by the epithets he used against the Plaintiff; his pre-existing animosity toward Mr. Tsadilas based upon his prior meetings with him and knowledge of Plaintiff's history with Defendant Roper's cousin; the admission that he wanted to take Mr. Tsadilas out on a boat with the Coustin and throw him overboard; his immediate release of the details of Mr. Tsadilas's arrest to the media; his admission that he would have preferred to arrest Mr. Tsadilas at his diner in order to embarrass him in front of his customers; his pursuit of this arrest and charges without investigating readily available exculpatory information; his pursuit of charges despite the absence of probable cause; his offering to not press charges if Mr. Tsadilas agreed to assign Callie away from his family; his continuation of process despite intervening

events, i.e. the removal of the Six Pound Mass, that otherwise further corroborated Plaintiff's innocence; and other facts and information.

72. Defendant Roper perverted the criminal process to obtain a collateral objective different from seeing the ends of justice done—namely, to gratify his own ego; to obtain vengeance against Mr. Tsadilas for telling him to "go f--- [himself];" and to settle scores for his cousin, with whom Mr. Tsadilas had had an acrimonious relationship many years in the past.

72. Plaintiff is entitled to compensatory and punitive damages to be decided by a jury.

73. Plaintiff is entitled to attorneys' fees under 42 U.S.C. Section 1988(b).

### THIRD: FALSE ARREST UNDER 42 U.S.C. §1983

74. Plaintiff reiterates and reasserts all prior allegations in this Complaint as if set forth more fully again herein.

75. Defendant Roper was at all times acting under color of state law and in the scope of his employment.

76. Defendant Roper intended to arrest Plaintiff and caused him to be confined.

77. The Plaintiff was aware of his confinement and did not consent to it.

78. The arrest and confinement of the Plaintiff was not supported by probable cause, and, to the contrary, readily available evidence demonstrated a high level of care that Plaintiff offered to Callie—including but not limited to veterinarian records showing proper attention to her medical conditions; a chip installed in Callie pursuant to protocols set by the American Kennel Club; records of at least one prior meeting between Mr. Tsadilas and the SPCA itself, at which Callie was deemed by a detective to be "alert, good weight, and happy;" observable evidence of the health of Mr. Tsadilas's other dog, Polo, about whom there were no allegations of malnourishment; a known and innocent explanation for Callie's appearance at the shelter—

namely, that she had gone missing and been in the rain and elements overnight; Mr. Tsadilas's own unwillingness to assign Callie over to Nassau County—despite express warnings that his failure to do so would come at great risk of criminal prosecution; and scans detecting a large but unknown tumor in Callie's stomach—a tumor that was not investigated or removed despite Dr. Tundo's recommendation.

79. The arrest and confinement of the Plaintiff was not otherwise privileged.

## FOURTH: MALICIOUS PROSECUTION (STATE LAW)

80. Plaintiff reasserts all of the above-stated allegations as if set forth more fully again herein.

81. Defendant Roper was at all times acting under color of state law and in the scope of his employment.

82. Defendant Roper was at all times acting with Defendant SPCA's assent, for its benefit, and under its control.

83. Defendant Roper initiated criminal proceedings against the Plaintiff in Nassau County, where he was charged with violating Section 353 of the Agriculture and Markets Law.

84. Defendant Roper advised and encouraged the ADA to prosecute the Plaintiff.

85. Defendant Roper signed the accusatory instrument against the Plaintiff.

86. The criminal charges against the Plaintiff were terminated in his favor as the sole charge resulted in a 'not guilty' verdict after trial.

87. Plaintiff's liberty was restrained post-arraignment, including by having to return to criminal court repeatedly pre-trial and at trial from July 2018 to September 2019, and during the entire period of time from his arraignment to the dismissal of charges had to render himself amenable to the orders and processes of the Court.

88. There was no probable cause to prosecute the Plaintiff at the time of his arrest or arraignment, and, to the contrary, readily available evidence demonstrated a high level of care that Plaintiff offered to Callie—including but not limited to veterinarian records showing proper attention to her medical conditions; a chip installed in Callie pursuant to protocols set by the American Kennel Club; records of at least one prior meeting between Mr. Tsadilas and the SPCA itself, at which Callie was deemed by a detective to be "alert, good weight, and happy;" observable evidence of the health of Mr. Tsadilas's other dog, Polo, about whom there were no allegations of malnourishment; a known and innocent explanation for Callie's appearance at the shelter—namely, that she had gone missing and been in the rain and elements overnight; Mr. Tsadilas's own unwillingness to assign Callie over to Nassau County—despite express warnings that his failure to do so would come at great risk of criminal prosecution; and scans detecting a large but unknown tumor in Callie's stomach—a tumor that was not investigated or removed despite Dr. Tundo's recommendation.

89. If there had been probable cause at the time of Plaintiff's arrest or arraignment, which there was not, it had dissipated in and around October 8, 2018, when the Six Pound Mass was discovered and removed, leading to Callie's rapid recovery.

90. Plaintiff is entitled to compensatory and punitive damages to be decided by a jury.

91. Plaintiff is entitled to special damages, including, inter alia, pecuniary damages to his diner and payments he had to make for criminal defense counsel.

92. Plaintiff is entitled to attorneys' fees under 42 U.S.C. Section 1988(b).

93. The SPCA is vicariously liable for the malicious prosecution committed by Defendant Roper under a theory of *respondeat superior*.

## FIFTH: MALICIOUS ABUSE OF PROCESS (STATE LAW)

94. Plaintiff reasserts all of the above-stated allegations as if set forth more fully again herein.

95. Defendant Roper was at all times acting with Defendant SPCA's assent, for its benefit, and under its control.

96. Defendant Roper employed regularly issued legal (criminal) process when he arrested and initiated the prosecution of Mr. Tsadilas.

97. Defendant Roper intended to cause Mr. Tsadilas harm without excuse or justification, a fact corroborated by the epithets he used against the Plaintiff; his pre-existing animosity toward Mr. Tsadilas based upon his prior meetings with him and knowledge of Plaintiff's history with Defendant Roper's cousin; the admission that he wanted to take Mr. Tsadilas out on a boat with the Coustin and throw him overboard; his immediate release of the details of Mr. Tsadilas's arrest to the media; his admission that he would have preferred to arrest Mr. Tsadilas at his diner in order to embarrass him in front of his customers; his pursuit of this arrest and charges without investigating readily available exculpatory information; his pursuit of charges despite the absence of probable cause; his offering to not press charges if Mr. Tsadilas agreed to assign Callie away from his family; his continuation of process despite intervening events, i.e. the removal of the Six Pound Mass, that otherwise further corroborated Plaintiff's innocence; and other facts and information.

98. Defendant Roper perverted the criminal process to obtain a collateral objective different from seeing the ends of justice done—namely, to gratify his own ego; to obtain vengeance against Mr. Tsadilas for telling him to "go f--- [himself];" and to settle scores for his cousin, with whom Mr. Tsadilas had had an acrimonious relationship many years in the past.

99. Plaintiff is entitled to compensatory and punitive damages to be decided by a jury.

100. Plaintiff is entitled to attorneys' fees under 42 U.S.C. Section 1988(b).

101. The SPCA is vicariously liable for the malicious prosecution committed by Defendant Roper under a theory of *respondeat superior*.

## DAMAGES

102. As a consequence of Defendants' conduct, Plaintiff suffered substantial damages, including loss of liberty, emotional distress, damage to his reputation, lost earnings at his diner, attorneys' fees, and other pecuniary damages.

103. Once news of Mr. Tsadilas's arrest hit the news, people began protesting and vandalizing Mr. Tsadilas's diner—including by, among other things, throwing feces on its walls.

104. Due to the Defendants' conduct, Mr. Tsadilas was known around his community as an animal torturer.

105. Defendants should be held liable not only to compensate Plaintiff for his damages, but also to pay exemplary damages large enough to dissuade such egregious misconduct from taking place again in the future.

106. Defendants should be liable to pay attorneys' fees associated with this action as per the terms of 42 U.S.C. §1988(b).

**WHEREFORE**, Plaintiff prays for relief as follows:

    A.    That the Court award compensatory damages to Plaintiff and against the Defendants in an amount to be determined at trial;

    B.    That the Court award punitive damages to Plaintiff and against Defendants in an amount to be determined at trial that will deter such conduct by peace officers in the future;

    C.    That the Court award attorney's fees pursuant to 42 U.S.C. § 1988(b);

    D.    For a trial by jury; and

    E.    For any and all other relief to which they may be entitled.

Dated: Garden City, New York
       May 19, 2021

**BARKET EPSTEIN KEARON ALDEA & LOTURCO, LLP**

By: _____
Alexander Klein, Esq.
666 Old County Road, Suite 700
Garden City, N.Y. 11530
(516) 745-1500